IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA

      vs.                        Criminal No. 20-374-7

   RANDY CAMACHO


-----


   Transcript of Sentencing held on Wednesday, February 22, 2023, in the United States District Court, 700 Grant Street, Pittsburgh, PA  15219, before Honorable Robert J. Colville, United States District Judge.


-----


APPEARANCES:

  For the Government:   U.S. Attorney's Office
                      by Rebecca L. Silinski, Esq.


  For the Defendant:    Joseph S. Otte, Esq.


  Court Reporter:       Noreen A. Re, RMR, CRR
                      700 Grant Street
                      Suite 5300
                      Pittsburgh, PA  15219




   Proceedings recorded by mechanical stenography;
transcript produced by computer-aided transcription.

2

P R O C E E D I N G S

THE COURT:  Good morning, everybody.  This is the time and place set for the sentencing of Randy Camacho at Criminal No. 20-374-7.  Counsel, would you be kind enough to identify yourselves for the record.

MS. SILINSKI:  Good morning, Your Honor.  Assistant US Attorney Rebecca Silinski on behalf of the United States.

MR. OTTE:  May it please the Court, Joe Otte on behalf of Randy Camacho.

THE COURT:  Welcome.  Mr. Camacho, my name is Robert Colville.  I'm the judge presiding over this proceeding. Mr. Klein, would you please place Mr. Camacho under oath.

(Oath administered.)

THE COURT:  By way of background of this case, on October 19, 2022, the defendant plead guilty to a lesser-included offense at Count 1 of the superseding indictment.  Specifically, he plead guilty to conspiracy to distribute a quantity of a mixture and substance containing cocaine, contrary to the provisions of 21 USC, Sections 841 (a)(1), 841(b)(1)(c) and in violation of 21 USC, Section 846.

The Court accepted Mr. Camacho's plea and adjudged him guilty of the charged offense.  At that time the parties informed the Court that the government and Mr. Camacho had entered into a plea agreement.  Thereafter I ordered that a presentence investigation be completed by the United States

Probation Office.

The final presentence investigation report was prepared on January 24, 2023.  It was disclosed to myself, to the defendant and his counsel and to counsel for the government.

The parties have filed written positions with respect to sentencing factors indicating that there are no objections to the PSR.  On February 7, 2023, the probation office filed an addendum.  On February 15, 2023, the defendant filed a sentencing memorandum requesting a downward variance.

The government has also filed a sentencing memorandum requesting the Court impose a within guidelines sentence. Prior to this hearing, I've reviewed the entire file in the case, including the presentence investigation report and the addendum thereto, the plea agreement between the parties, the government's and the defendant's written positions with respect to sentencing factors, the sentencing memoranda and all the exhibits thereto, including letters from Anthony Andiorio, Barbara Grimm, Stanley Phillips, Jr., and Donald Lowe, the probation office's proposed applications of the United States Sentencing Guidelines, the sentencing guidelines themselves and the recommendation of the probation office with regard to an appropriate sentence.

Mr. Otte, have you reviewed the presentence report and addendum and discussed and reviewed those documents with

4

Mr. Camacho?

MR. OTTE:  Yes, Your Honor.

THE COURT:  Are there any errors in those documents that you've not already brought to the Court's attention?

MR. OTTE:  No, Your Honor.

THE COURT:  Thank you.  Mr. Camacho, have you had an opportunity to review the presentence report and the addendum and discuss those documents with Mr. Otte?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you have any questions or concerns about those documents at all?

THE DEFENDANT:  No, sir.

THE COURT:  Very good.  Are you satisfied with the service, the advice and representation that's been provided to you by Mr. Otte?

THE DEFENDANT:  Yes, sir.

THE COURT:  Do you need to speak privately with Mr. Otte on any matter before we proceed with sentencing?

THE DEFENDANT:  Yes, sir.

THE COURT:  Okay.  I can step out, and you guys can --

(Counsel and defendant confer.)

THE COURT:  Mr. Otte, if you need space --

MR. OTTE:  No, Your Honor.  We're good.  He was just confused about the procedure.

THE COURT:  Very good.  Counsel, are there any other materials that the Court should have received prior to sentencing but has not?

MS. SILINSKI:  No, Your Honor.

THE COURT:  Mr. Otte, anything else -- is there anything else I should have received that I have not?

MR. OTTE:  No, Your Honor.

THE COURT:  Thank you.  I'll remind everybody -- counsel know this, but the United States Sentencing Guidelines are advisory only.  The Court has discretion to deviate or vary from the guidelines, after considering the factors set forth in 18 USC, Section 3553(a).

The Court must also, of course, rule on motions for departure or motions -- excuse me, request for variance.  I do hereby at this time adopt the factual findings and the guideline applications in the presentence investigation report, and I make the following advisory guideline -- sentencing guideline calculation.

Mr. Camacho, I'm required by law to do this calculation.  It's a bit detailed, so be patient with it.  At Count 1 the guideline for 21 USC Section 846 and 841(a)(1) offenses is found in Sentencing Guideline Section 2D1.1.

Based on the offense conduct, the amount of cocaine attributable to the defendant is at least 300 grams, but less than 400 grams.  This calls for a base offense level of 20.

6

The offense level is decreased by two points due to the defendant's acceptance of responsibility pursuant to Guideline Section 3E1.1(a).

The offense level is decreased by one additional level pursuant to Guideline Section 3E1.1(b).  Accordingly, the total offense level is 17.  The defendant's relevant criminal convictions compute to a criminal history score of 13.  The defendant committed the instant offense while on probation at Allegheny County Docket No. CP-17045-2009. Therefore, two points are added for a total score of 15.

According to the sentencing table in Guideline Chapter 5, Part A, a criminal history score of 15 establishes a criminal history category of VI.  According to the sentencing table in Chapter 5, Part A, a total offense level of 17 and a criminal history category of VI results in a guideline range of 51 to 63 months incarceration.

Because the offense is a Class C felony, the guideline range for a term of supervised release is one to three years.  However, the term of supervised release imposed shall be not less than any statutorily required term of supervised release, in this case three years.  The defendant is not eligible for probation.

According to Section 5E1.2(c)(3), the guideline range for a fine is $10,000 to $1 million.  A special assessment fee of $100 is mandatory.  The defendant agreed to forfeit to the

government $2,100 in United States currency.

At this time I would like to call counsel and Mr. Camacho to sidebar.  I would note for the record there is nobody in the courtroom who cannot be privy to the sidebar, I believe, so counsel can remain at their tables.

(Sidebar discussion held.)

(Sidebar discussion concluded.)

THE COURT:  We're now back in open court.  Before I invite any testimony or hear any argument, I note that the Court has received and reviewed the defendant's sentencing memorandum requesting that the Court vary from the guidelines and impose a sentence of time served, effectively 27 months or approximately 27 months, arguing that such a sentence is sufficient, but not greater than necessary, to comply with Section 3553(a).  I'll invite argument from counsel in a moment, but do either counsel have any witnesses to offer at this time?

MS. SILINSKI:  No, Your Honor.

MR. OTTE:  No, Your Honor.

THE COURT:  Very good.  Do the parties have any other additional documentary evidence for the Court's consideration at this time?

MS. SILINSKI:  No, Your Honor.

MR. OTTE:  No, Your Honor.

THE COURT:  Mr. Otte, do you have any further

8

argument in support of your motion for variance or as to an appropriate sentence, broadly speaking, in this case?

MR. OTTE:  Yes, Your Honor.  Just briefly.  With regard to the grounds in my sentencing memorandum on behalf of Mr. Camacho, I just would like to address the three-point offense for the escape.

Writing some of these filings, it's often difficult to really capture what it is that agitates a defense attorney about a three-point offense and why, as a matter of policy, it should not be a three-point offense.  It should be a zero-point offense.  And it, in fact, shouldn't be an offense at all.

As somebody who's practiced in Allegheny County Court of Common Pleas, I cannot tell you how many times I have had escape charges where my clients are just absolutely confused about how they escaped when what they, in fact, did is fail to return to the Renewal Center.

There have been instances where somebody shows up five minutes late to Renewal or they come back, they're afraid to go back in, because they're afraid they're going to test positive for a controlled substance they used while they're out.  And then they're subsequently charged with escape.

Now, when it comes to a charge like escape, it appears in the presentence report accurately as a three-point offense.  But what that reflects is essentially double

punishment.  It is a way in which the legislature and the Commonwealth has created what is, in fact, a violation of the terms of somebody's incarceration into a new offense.

And I understand why that came about.  I understand how such an offense undermines those types of nonincarceration sentences that exist throughout the Commonwealth, which are a good thing.  But it being a new offense and it being an offense that carries with it severe consequences is bad policy.

Following Booker, luckily district court judges are empowered to not necessarily disregard the law as it is, but to make determinations based on policy.  And I would ask that Your Honor credit that as a zero-point offense essentially as a matter of policy.

It's much different than an escape where somebody forcibly escapes custody.  The title of the statute is "Escape," but in common parlance nobody would ever consider that an escape.  It's unfortunate -- and I hope that the Sentencing Commission somehow takes that into account when it issues new guidelines, but it is unfortunate that that is treated so harshly when, in fact, those instances are, in reality, just violations of the terms of somebody's conditions of release.

So that's really what I have to say about the three-point offense.  And I understand the government's position,

absolutely.  The government's position is based on the guidelines.  And the guidelines are empowered by law.  But, as a matter of policy, it's just something where it's unfair.

And then with regard to the arguments I made under the First Step Act, again, this is sort of an issue where the law is imperfect.  We know the law is imperfect.  There are many instances in which we, as lawyers, and oftentimes judges struggle with the imperfections in the law.

It's a fact of life.  It's something I'm glad I don't have to grapple with from the bench.  But the fact of the matter is that if Mr. Camacho had had adequate counsel earlier on in this case, he would have been able to accept the plea offers that he was eager to accept.  He would have been able to move on to BOP custody much earlier.

I'm not here to smear his prior attorneys, but the fact of the matter is they weren't doing their jobs.  And because of that, Mr. Camacho had to sit in the Butler County Prison for much longer than he normally would have, had he had adequate prior counsel.

And that sort of relates to an issue that's not in the sentencing memorandum that I did want to bring up, and it's that credit for the custody that he was in while the Butler County Prison was still under lockdown and restrictions related to COVID.  Mr. Camacho was not in in March of 2020, but he was in December of 2020.

11

It seems like very long ago, but I remember the Butler County Prison at that time.  Everybody was still wearing masks, because vaccines had not come out.  The restrictions within the pods were much more severe than the restrictions outside that we experienced.

And the programming was not available to him, but he still was able to do programming as soon as they started lifting some of the restrictions.  And he did do that programming.  But because of the imperfections in the law, he does not receive any credit for that programming.

If he had been in BOP custody, which he would have been able to enter into sometime in late -- or, excuse me, middle 2021, late 2021, he would have been afforded credit for programming.  And that's one of the things the First Step Act, I think, is really going to improve is that it will likely encourage people to get out of pretrial detention and into BOP custody just as a matter of efficiency in the courts.  Because once somebody is in BOP custody, they will be able to start accruing significant credit.

And I don't think just because -- the way we treat these cases and in trial courts we don't often see what happens under supervision or incarceration.  I don't think we fully recognize how much credit they'll start receiving until we end up seeing these cases on violations.  Because somebody doing a ten-year sentence in BOP custody, one, receives the

15 percent reduction or they serve 85 percent of the sentence as good time credit, but also they will start receiving, if they comply with the programs, up to 15 days off of their sentence for every 30 days in custody.  That's going to be a huge benefit for people.  It will be a driver to get them into programming.  But it will also reduce sentences.

Now, it's impossible to tell you how much time Mr. Camacho would have saved off of his sentence; and the BOP will never be able to calculate that, because he never will be able to go into that programming.  But he would have received some reduction in his sentence, almost certainly.

So that's one of the factors that I think that is important that justifies a variance.  The degree to which it justifies a variance I do not know.  And I don't envy the position of a district court judge in assessing such a thing.

So all that with regards to the variance request.  I also just wanted to say that time served puts Mr. Camacho back in a job earning money.  And he will be on supervised release.  He will be accountable.  And if he violates, he knows where he ends up.  So with that sentence of time served as sufficient, but not greater than necessary.  I would ask that Your Honor sentence him to time served.

THE COURT:  Thank you, Mr. Otte.  Ms. Silinski, I have read, of course, the government's position papers, but is there anything you care to offer regarding the government's

position respecting an appropriate sentence in the case?

MS. SILINSKI:  Your Honor, only to reiterate that certainly, as defense counsel indicated, not envying the Court in trying to assess good time credit is specifically why that is something that is directed to the Bureau of Prisons.  There is calculations involved, assessments.  They have reviewed the presentence reports and have an opportunity to gauge based upon a number of factors that the Court is not required to do so.

Your Honor, as it relates to the job and the fact that he would have a job while on supervised release and that is a basis for which he should be released, I would note to the Court that Mr. Camacho had that job when he was committing the underlying offenses in this case, selling cocaine.

Law enforcement located the $2,100 that's proceeds of drug trafficking.  So, Your Honor, the fact that he had a job, while certainly wonderful and important -- and I do hope that he will go back to that job and remain out of the drug trafficking world.  But, nonetheless, Your Honor, he had that job then.  And that did not dissuade him from continuing to want to make more money and to make money illegally through drug trafficking.

So, Your Honor, I think the guideline range in this case reflects all of the considerations for the Court.  The United States is not seeking a high end of the guideline

14

range.  As I noted in the sentencing memorandum, a sentence of 51 months falls within that window of what defense counsel has requested for the Court to vary to a category V.

So I think 51 months is adequate for Mr. Camacho.  It also would not result in any unwarranted sentencing disparities.  This Court has had an opportunity to sentence a number of individuals who have been involved in this and related cases.  And it does reflect his individual responsibility, but also his role within the bigger picture.

And certainly his prior criminal history is something that has to be considered by way of a sentence.  With that, Your Honor, I would maintain the position of a sentence of 51 months is appropriate.

THE COURT:  Thank you, Ms. Silinski.  Mr. Camacho, you don't need to feel obliged, but you are -- you have a right to be heard.  So if there is anything you want to say, this is your opportunity.

THE DEFENDANT:  Yes, Your Honor, I do.

THE COURT:  You can speak or not speak at your pleasure.

THE DEFENDANT:  First, I want to say sorry to my family for the time I can't give back to them.  Your Honor, the money I made by selling drugs did not override the time I'm doing in jail.  I can't get that back.  But I know that I still have my job, and I'm thankful to work for Borghese Lane.

15

Me getting up seven days a week, every morning drinking a cup of coffee, getting there before my boss, starting up the boat, knowing that the boat is ready for me to go up and down the river and do something I love to do is the best feeling in the world.

When you're doing something you love and you're at work, it overrides the negative and turns a positive into a greater outcome in life.  And I know if you gave me the opportunity, Your Honor, again, to prove to myself, to prove to my family and to prove that I can live in society the right way and don't have to do the negative things that I was doing in life, I can just keep on working and turn my short-term goal into a long-term goal and work three years and end up being a captain making a lot of money.

As of right now, I make $22 an hour.  167 hours every two weeks with my paychecks is enough money to make to last me month to month to pay bills and survive the right way how I have to survive.  If I end up being a captain, I can make up to $50 to $60 an hour.  That would be over six figures a year, what I would love to do.

And the only thing that revolves me from stopping getting -- going back to my job is me being incarcerated.  I learned, and I grown to be a better person.  I am not the same person I was that you're judging me by 15 years ago.  I know now that the responsibility I have and getting older -- I am

36 years old, and I only want to do better in life and leave the negative and turn everything to a positive way.  Thank you, Your Honor, for giving me this time to speak.

THE COURT:  Thank you, Mr. Camacho.  Mr. Otte, is there any legal reason why sentence cannot be pronounced?  Or is there anything else you care to offer on behalf of your client?

MR. OTTE:  No, Your Honor.

THE COURT:  Thank you.  Having considered the parties' arguments and the facts of record, including the presentence investigation report and the statement of Mr. Camacho and the argument of counsel, and after consideration of all the Section 3553(a) factors, I'm going to deny the request for a variance.  I understand the argument. I'm not entirely unsympathetic to the spirit of it.

But, frankly, it's simply not -- it doesn't carry the day at the end of the day in my mind.  And, ultimately, the defendant's request for a downward variance is not warranted, because I do find that a sentence within the advisory guidelines is -- although albeit the very bottom of the guidelines is sufficient, but not greater than necessary, to satisfy the stated purposes of sentencing, including just punishment, deterrence, protection of the public and rehabilitation of the defendant.

Mr. Camacho, pursuant to the Sentencing Reform Act of

17

1984, it's the judgment of the Court that you be hereby committed to the custody of the Bureau of Prisons to be imprisoned for a term of 51 months of imprisonment at the lesser-included offense at Count 1.

Mr. Otte, is there any request regarding what facility?  Are we looking for a place closer to Pittsburgh or any other location?

MR. OTTE:  Yes, Your Honor.  Closer to Pittsburgh.

THE COURT:  I'll make the recommendation to the Bureau of Prisons that they make an effort to keep you as close to Pittsburgh as possible.  I don't have control over that, but the recommendation sometimes helps.

Upon release from confinement, Mr. Camacho shall be placed on supervised release for a term of three years at the lesser-included offense at Count 1.  Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which he is released.  The Court finds that Mr. Camacho does not have the ability to pay a fine; therefore, imposition of a fine is waived.

Pursuant to the plea agreement, Mr. Camacho forfeits to the government $2,100 in United States currency. Mr. Camacho, several conditions of supervision will apply when you're released.  I'm required to state them now.  So I identify the following:

18

While on supervised release, the defendant shall not commit another federal, state or local crime.  He shall comply with the standard conditions of supervision recommended by the Sentencing Commission and adopted by this Court.

And he shall comply with the following additional conditions:  The defendant shall not illegally possess a controlled substance.  The defendant shall not possess a firearm, ammunition, destructive device or any other dangerous weapon.  The defendant shall participate in a program of testing and, if necessary, treatment for substance abuse.  That program is to be approved by the probation officer until such time as the defendant is released from the program by the Court.

Further, the defendant shall be required to contribute to the cost of those programs or that programming for any such treatment in an amount to be determined by the probation office but, of course, not to exceed the actual cost.

The defendant shall submit to one drug urinalysis within 15 days after being placed on supervision and at least two periodic tests thereafter.  The defendant shall not intentionally purchase, possess and/or use any substances designed to simulate or alter in any way the defendant's own urine specimen.

In addition, the defendant shall not purchase,

possess and/or use any devices designed to be used for the submission of a third-party urine specimen.  The defendant shall participate in the United States Probation Office's Workforce Development Program as directed by the probation officer.

The defendant shall submit his person, property, house, residence, vehicle, papers, business or place of employment to a search conducted by a United States Probation or Pretrial Services officer at a reasonable time and in a reasonable manner based upon reasonable suspicion of contraband or evidence of violation of a condition of supervision.  Failure to submit to a search may be grounds for revocation.  The defendant shall inform any other residents that the premises may be subject to searches pursuant to this condition.

The defendant shall cooperate with the collection of DNA as directed by the probation officer pursuant to 28 CFR, Section 28.12, the DNA Fingerprint Act of 2005 and the Adam Walsh Child Protection and Safety Act of 2006.

The defendant, as noted before, shall forfeit to the government $2,100 in United States currency.  It is further ordered that the defendant shall pay to the United States a special assessment of $100.

Mr. Camacho, I'm required to state at this hearing the reasons for the Court's imposition of sentence, so I offer

20

you the following.  The sentence, as imposed, first of all, adequately conforms with all the statutory requirements; and it accounts for all the information contained in the record. Based on your background, a sentence of 51 months imprisonment at the lesser-included offense at Count 1 followed by a term of supervised release of three years is appropriate in this case and will, I hope, deter you and others from engaging in similar criminal activity in the future.  The fine is waived, and a special assessment of $100 is mandatory.

The sentence imposed is intended to balance, on the one hand, your acceptance of responsibility with, on the other hand, the very serious nature and the consequences of your offenses, as well as the needs for just punishment, deterrence and rehabilitation.

Furthermore, the sentence is, in my view, sufficient, but not greater than necessary, to comply with the stated goals of sentencing as set forth in Title 18, United States Code, Section 3553(a), which are -- and I'll quote them verbatim.  To reflect the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense; B, to afford adequate deterrence to criminal conduct; C, to protect the public from further crimes by this defendant; and, D, to provide the defendant with needed education or vocational training, medical care or other correctional treatment in the most effective manner.

21

The Court has considered all of the sentencing factors as set forth in Title 18, United States Code, Section 3553(a), including those presented by the government and the defense and as set forth in the presentence investigation report and the addendum thereto.

Furthermore, the Court has considered the following factors more specific to Mr. Camacho and his offense itself. First, the nature and circumstances of the offense. Mr. Camacho plead guilty to a serious offense, specifically conspiracy to distribute cocaine.

The Greater Pittsburgh Safe Streets Task Force led by the FBI conducted a long-term investigation into drug trafficking activity in Western Pennsylvania.  Law enforcement identified several individuals suspected at the time of illegally distributing controlled substances, including heroin, cocaine and methamphetamine in Allegheny and several surrounding counties.

Based upon the government's evidence and for purposes of the plea agreement, the parties stipulated that the defendant, Mr. Camacho, is responsible for between 300 and 400 grams of cocaine.  That offense is plainly very serious in nature.

The Court also considered factors more specific to Mr. Camacho himself, including his criminal, family and social history, as well as personal characteristics, as outlined in

the presentence investigation report, which offers the following:

Mr. Camacho is 36 years old.  He's married.  He has two children from another relationship with whom he had regular contact prior to his incarceration.  The defendant described his upbringing as somewhat dysfunctional due to his mother and stepfather's drug use.  The defendant himself began using drugs and alcohol at a young age and also experienced a traumatic death of a friend who died of an overdose.

The defendant reported he is otherwise in overall good health.  The defendant stated he was diagnosed with anxiety at the Butler County Jail following his arrest for this offense.  He indicated he was currently at that time prescribed Prozac.  The defendant has a significant and lengthy history of substance abuse.  Accordingly, substance abuse conditions are clearly appropriate and warranted.

The defendant dropped out of school in the ninth grade, and he's had a somewhat limited employment history.  That said, the defendant advised that he would be able to return to his job at Borghese -- is this correct -- Borghese Lane Towing for whom he started work in 2019 after he finishes his term of imprisonment.

The defendant has, unfortunately, a rather lengthy criminal history including, among other things, convictions for possession with intent to deliver cocaine, escape -- and I

note Mr. Otte's arguments respecting at least one of those escapes -- illegal firearm possession, driving under the influence, heroin possession and resisting arrest. He was also on probation at the time of this offense.

While, as I noted, I acknowledge Mr. Otte's argument that his criminal history score in one regard in particular arguably overstates the seriousness of his criminal history at least to some extent, I can't help but note that, setting that aside, Mr. Camacho has a number of convictions for serious crimes. He's acknowleged -- I think Mr. Otte is required to acknowledge that technically the prior criminal history score is correctly calculated.

I have also taken into account the defendant's argument regarding his inability to resolve the case in as timely a fashion as he may have preferred to occur. And, again, I'm not unsympathetic to that. Mr. Camacho is not -- I don't blame him for raising it or Mr. Otte for raising it. Many defendants have raised it.

The conditions and opportunities presented at our local facilities, particularly during the pandemic, have been disappointing. But it was a worldwide pandemic. And we all -- I'm not saying equally were impacted or suffered, but it interfered with everybody's lives. And I have no doubt that it greatly interfered with everyone at the Butler County Prison's experience. And I'm sorry for that. I really am.

24

It's not the kind of thing I can fix in sentencing.

I'm not unappreciative or insensitive to the disruption of the normal pattern that may have otherwise flowed.  And I'm sorry for it.  But it's not a thing that I can fix in either Mr. Camacho's case or, for that matter, the many other defendants who have raised similar arguments and concerns regarding opportunities lost and opportunities not presented because of what has happened recently over the last few years in our correctional facilities as a result of the pandemic and other issues.

All of these issues taken together -- and I mean this respectfully and without any, again, disregard for Mr. Camacho's stated intention to get on with a productive, gainfully employed life.  But at this moment Mr. Camacho presents as a danger to the community and a risk of recidivism.

I hope that things have changed.  Up until this last event, things had not.  So we are where we are.  I wish Mr. Camacho well.  But that's the history that exists, and it's impossible for me to ignore or deny it.

I do, nonetheless, note Mr. Camacho took full responsibility for his actions; and he's expressed even here today his commitment to getting on with his life.  Developing a career is a plan.  He's does some math, and I say good for him.  That's wise, and I encourage it.

It's some time before he can start that.  That's the only way I can put it to you plainly and honestly.  The Court has further considered the kind of sentence available for this offense, the sentencing guideline range under the advisory guidelines and the applicable policy statements adopted by the Sentencing Commission.

Finally, the Court has considered the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.  Frankly, it's in this regard that the Court's sentence particularly with regard to 51 months is most impacted.

I simply cannot justify -- notwithstanding the arguments made by Mr. Otte, very capably, I can't justify treating Mr. Camacho substantially different than I would treat other people in very similar circumstances.  So he is where he is.

After consideration of all the factors, I find that a sentence at the very low end, the lowest end of the guidelines, is appropriate.

Mr. Camacho, you're going to receive a copy of the judgment order, which will contain a written description of my judgment and all the conditions I've imposed, particularly upon your release to supervised release.  That document will serve as a guide for your conduct moving forward.  After your release, please make sure you read it.

26

If you don't understand it, speak to your attorney or probation officer and have them explain it to you. You don't want to accidentally violate your conditions of release.

Finally, I have to advise you of your rights. You do have a right to file an appeal. Your appeal rights are limited to the following three situations pursuant to your plea agreement. No. 1, if the government appeals your sentence, you may then appeal. If the sentence exceeds the applicable statutory limits set forth in the United States Code, you may appeal.

And, No. 3, if the sentence unreasonably exceeds the guideline range determined by me under the sentencing guidelines, you may then appeal. Finally, you may appeal any error that has resulted in a genuine miscarriage of justice.

If you do choose to file an appeal, you must do so within 14 days. If you request it, my clerk will immediately prepare and file a -- excuse me. My clerk will immediately prepare and file a notice of appeal on your behalf.

You have the right to apply for leave to appeal in forma pauperis, which means that you would be -- I should say which would be granted if you were without sufficient funds. If you're granted leave to file in forma pauperis, then the Court disregards filing fees and costs. You also have the right to have a lawyer represent you on appeal.

If you cannot afford an attorney, you can petition

27

the Court of Appeals to appoint one to represent you without cost. If you cannot afford certified copies of the necessary records and transcripts, those will be furnished at the expense of the United States government.

Mr. Camacho, do you understand your appellate rights as I just described them?

THE DEFENDANT: Yes, sir.

THE COURT: Very good. Thank you, sir. Counsel, are there any other matters for consideration before the sentencing hearing is concluded?

MS. SILINSKI: Your Honor, I would move to dismiss the original indictment in this case as to Mr. Camacho.

THE COURT: Without objection, the original indictment will be dismissed as described. Anything else, Mr. Otte?

MR. OTTE: Nothing, Your Honor.

THE COURT: Mr. Camacho, I'm not going to pretend like today is a happy day or anything. I'm not your father or your big brother. I don't love you like they might or a good friend, but I respect you as a human being; and I wish you the best.

I'm not kidding you when I tell you, you sat down and you put pen to paper. You have a plan. You have an idea of what you want to be and what you want to do and how you can get there. That's good. That's where you need to start.

28

Again, I wish I could give you better news than you got to go back to prison for a while, but it's only for a while.  That plan is still going to be there for you.  You got time to work on it, work on yourself.  My point is I wish you well.  I hope things go well.

Please treat the people who are working around you and living around you with respect and courtesy, and I hope and trust they'll extend the same to you and will keep you safe; okay?  I wish you the best, sir.  Thank you.  We're adjourned.

-----

(Whereupon, the above-captioned matter was concluded.)

-----

C E R T I F I C A T E

I, NOREEN A. RE, RMR, CRR, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled case.


s\ Noreen A. Re                    March 29, 2023
NOREEN A. RE, RMR, CRR          Date of Certification
Official Court Reporter